**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


SHARON H. FRETWELL,

   Plaintiff,

v.           CASE NO.  4:08cv430-RH/WCS

KANSAS CITY LIFE INSURANCE
COMPANY et al.,

   Defendants.

_____/


**ORDER DENYING KANSAS CITY LIFE'S MOTION TO ALTER OR
AMEND THE JUDGMENT AND VOLUNTARILY DISMISSING
MS. FRETWELL'S CLAIMS AGAINST MR. McNEASE**


   This is a dispute over the amount due under two life insurance policies.  A

judgment has been entered against the insurer based on a jury's determination of

the critical facts.  The insurer has moved to alter or amend the judgment.  The

plaintiff has moved to voluntarily dismiss her claims against another defendant—

the agent who placed the coverage.

   The jury's findings were fully supported by the evidence.  Indeed, the

insurer makes no real claim to the contrary.  The insurer's motion is based instead

on its disagreement with my reading of the insurance policies and my view of

Florida law.  I deny the motion to alter or amend.  I grant the motion to voluntarily dismiss the claims against the agent.

## I.  The Uncontested Background Facts

On February 28, 1995, John Fretwell met in person with Y. C. McNease, an agent of the defendant Kansas City Life Insurance Company, to apply for a $100,000 policy.  Mr. McNease filled out an application in his own handwriting.  The application correctly listed Mr. Fretwell's age as 52.  On April 1, 1995, Kansas City Life issued the policy.  The body of the policy erroneously listed Mr. Fretwell's age as 46, but the policy also incorporated the application by reference, thus correctly listing Mr. Fretwell's age as 52.

On June 28, 1995, Mr. Fretwell met with Mr. McNease to apply for an additional $250,000 policy.  Mr. McNease again filled out an application.  It erroneously listed Mr. Fretwell's age as 46.  On August 1, 1995, Kansas City Life issued the policy.  It again incorporated the application by reference, but this time the age on the application was wrong.

Mr. Fretwell died on June 12, 2006, while the policies were current and in force.

The beneficiary was Mr. Fretwell's wife, the plaintiff Sharon H. Fretwell.  She made a claim for the face amount of the policies.  The claim listed Mr. Fretwell's correct birth date.  Kansas City Life figured out that the body of the

policies listed Mr. Fretwell's age incorrectly. Because of the error, Mr. Fretwell paid lower premiums than would have been required for a person of his actual age to buy the same policies. For the premiums he actually paid, Mr. Fretwell could have bought policies with lower death benefits.

## II. The Proceedings

Ms. Fretwell filed this action claiming the full death benefit due under the policies without any reduction based on the errors. She named Kansas City Life and Mr. McNease as defendants. She asserted that Kansas City Life owed her the face amount of the policies, and that if it did not, then Mr. McNease was liable for the difference. Kansas City Life asserted it owed Ms. Fretwell only the lower amount of insurance that the same premiums would have purchased based on Mr. Fretwell's actual age. Mr. McNease denied any liability.

Kansas City Life filed motions for judgment on the pleadings and for summary judgment. It invoked provisions in the insurance policies and in a Florida statute that explicitly adopt Kansas City Life's proposed methodology for dealing with errors in an insured's age. Ms. Fretwell admitted that Kansas City Life would have been correct if Mr. Fretwell had provided the incorrect information, but she asserted the mistake was solely Mr. McNease's. I denied Kansas City Life's motions for judgment on the pleadings and for summary judgment, ruling that under the policy language and statute, if Mr. Fretwell

provided accurate information to Kansas City Life's agent when he applied for a policy, his beneficiary would be entitled to the full death benefits, reduced only by the additional premiums that would have been required to buy coverage in that amount.

The case proceeded to a jury trial on Ms. Fretwell's claims against Kansas City Life. Trial of the claims against Mr. McNease was deferred in accord with Florida decisions suggesting that a claim of this kind against a professional should proceed only after it is determined, by a final resolution of the underlying claim, that the professional's errors caused a loss to the plaintiff.

The jury returned a verdict in Ms. Fretwell's favor on the $100,000 policy and in Kansas City Life's favor on the $250,000 policy. At my direction, the clerk entered a judgment in accord with the verdict. Kansas City Life has moved to alter or amend, asserting that the legal theory underlying the jury verdict was incorrect, and that it is entitled to judgment as a matter of law—essentially the same argument that Kansas City Life made and lost on its motions for judgment on the pleadings and for summary judgment. Separately, Mr. McNease has asserted that the verdict entitles him to judgment, and Ms. Fretwell has moved to voluntarily dismiss her claims against Mr. McNease.

## III. The Jury's Factual Findings

After a full and fair trial, the jury answered special interrogatories resolving

the critical factual issues as follows.

A

*When Mr. Fretwell applied for the $100,000 policy, he did not provide Mr.*
*McNease an incorrect date of birth or age.*

This finding is supported by the overwhelming weight of the evidence. Mr.
Fretwell applied for the policy on February 28, 1995, during a face-to-face meeting
with Mr. McNease. Mr. McNease asked Mr. Fretwell the questions on the
application and recorded Mr. Fretwell's answers. Among other things, the
application asked for the applicant's birth date and age. Mr. McNease recorded
Mr. Fretwell's birth date as 1/29/49 instead of the correct date, 1/29/43. But
immediately after that, Mr. McNease recorded Mr. Fretwell's age as 52—the
correct age.

One possibility is that Mr. Fretwell provided the correct age but the incorrect
birth date, but this seems unlikely. Mr. Fretwell obviously was not trying to fool
anyone; he said his age was 52. He could have remembered his birth date
incorrectly, but people rarely do that. He could have said it wrong, but that again
would be unusual. The most reasonable explanation is that Mr. Fretwell said
1/29/43 and Mr. McNease wrote 1/29/49. Erroneously recording "49" instead of
"43"after hearing and recording "29" in a string of numbers would not be an
unusual error.

To be sure, Mr. Fretwell was diagnosed with early-onset Alzheimer's disease only three years after he submitted the application. He could have already had the disease. But the record includes no evidence of that. And even an Alzheimer's patient can usually provide his correct birth date, at least in the early stages of the disease. Or so a reasonable juror could conclude in the absence of contrary medical testimony.

In short, the jury reasonably concluded that when Mr. Fretwell applied for the $100,000 policy, he provided Mr. McNease his correct age and birth date.

B

*Mr. Fretwell did not learn before his death that the $100,000 policy included or was based on a mistake in his age.*

Kansas City Life makes no use of the *age* listed in an application. Instead, it inputs into its computer the *birth date* listed in the application. The computer program calculates the age.

Kansas City Life does this so that it can readily determine the insured's age from time to time, not just at the date when the policy was issued. Thus, for example, Kansas City Life sends an annual report listing an applicant's age at the time of the report. An insured's age of course changes over time, but the birth date does not. With the birth date, the insured's correct age can be automatically calculated and listed correctly in a report prepared at any time.

Using the birth date, Kansas City Life calculated Mr. Fretwell's age when the $100,000 policy was issued as 46, even though he had told Mr. McNease his age was 52, and even though the application—which was incorporated into the policy by reference—explicitly listed his age as 52. Had Mr. Fretwell read the policy, he would have seen the incorrect age. In addition, Kansas City Life sent Mr. Fretwell an annual report each year showing his age at the time. Had Mr. Fretwell read any one of the annual reports with care, he would have seen the incorrect age.

The jury found, though, that Mr. Fretwell did not learn of the error. The finding makes sense. Some people may read their life insurance policies cover to cover, but many do not. Some may read their annual reports in every detail, but many do not. Jurors are especially good at resolving issues that, like this one, turn on common experience and an understanding of ordinary human behavior. The jury's conclusion that Mr. Fretwell did not learn of the error is reasonable. And further support for the conclusion comes from the fact that Mr. Fretwell had Alzheimer's disease during some or all of the period.

C

*When Mr. Fretwell applied for the $250,000 policy, he provided Mr. McNease an incorrect date of birth and age.*

The application for the $250,000 policy listed the same erroneous birth date

as the $100,000 application: 1/29/49.  But the $250,000 application, unlike the $100,000 application, also listed Mr. Fretwell's *age* incorrectly.  The $250,000 application listed Mr. Fretwell's age as 46.  This was the age that the computer program or anyone doing the math would have calculated based on the erroneous birth date first provided in the $100,000 application.

There is only one reasonable explanation.  The birth date and age on the $250,000 application came from the birth date that was listed in the $100,000 application and that in turn was incorporated into Kansas City Life's computer data.  At the time of the $250,000 application, the computer data already included Mr. Fretwell's incorrect birth date—1/29/49—and the computer had the capacity to calculate his age—46.  A person consulting the data would have obtained precisely the same incorrect information as turned up on the $250,000 application.

Mr. McNease thus could have obtained the incorrect birth date and age from the computer data or from some report or other output derived from the computer data.  There is no other reasonable explanation for how the $250,000 application included the same incorrect birth date as the $100,000 policy but, unlike the $100,000 policy, listed the incorrect age that corresponded with the incorrect birth date.

To be sure, Mr. McNease testified that he got the information that he wrote on the $250,000 application from Mr. Fretwell himself.  But he admitted he did not

remember this specific application or his discussion with Mr. Fretwell; he only knew that his practice was to ask for the information and to immediately record it. Mr. McNease admitted he sometimes got other information from the files, including, for example, an applicant's address. He says he never got an age or birth date from the files, but one of course does not remember what one does not remember.

It seems most unlikely that Mr. McNease got this information from Mr. Fretwell. For that to have occurred, the chronology would have had to be as follows. First, on February 28, 1995, Mr. Fretwell would have said his birth date was 1/23/43 but Mr. McNease would have recorded it as 1/29/49 (as likely happened) or Mr. Fretwell would have said his birth date was 1/23/49 (an incorrect date) but his age was 52. Four months later, on June 28, 1995, Mr. Fretwell would have said his birth date was 1/23/49 (remarkably, the same incorrect birth date he gave four months earlier, or, more remarkably still, the same date Mr. McNease incorrectly recorded four months earlier), and this time Mr. Fretwell would have said his age was 46 (the first time Mr. Fretwell made this mistake but, remarkably, a mistake that lined up perfectly with the incorrect birth date that he provided or Mr. McNease recorded four months earlier). If intended to defraud, this would have been one of the most inept efforts ever, because Mr. Fretwell initially gave his correct age. If an error—either from misstating the facts or as a result of

Alzheimer's—it was a remarkable error, getting exactly the same wrong birth date in statements four months apart, and the second time also giving a mistaken age that happened to match up with the misstated or improperly recorded birth date. The assertion that Mr. Fretwell was the source of the incorrect information just does not wash.

From this, one might conclude it was all Mr. McNease's fault. But there is more to it. The $250,000 application unequivocally listed Mr. Fretwell's birth date as 1/29/49 and his age as 46. Nothing on the face of the application hinted at an error. *Mr. Fretwell signed the application.*

The questions put to the jury were whether Mr. Fretwell provided an incorrect age and birth date when he applied for the $250,000 policy. During its deliberations, the jury sent a note that gave a clear indication of its (entirely reasonable) assessment of what happened. The jury asked:

> If a juror believes that on the second application ($250,000) the agent filled in the date of birth and age based on the previous application without asking Mr. Fretwell and that Mr. Fretwell signed the application with the incorrect information wouldn't she/he have to rule "Yes" [to the question whether Mr. Fretwell "provided" an incorrect age and birth date]?

(Document 146 at 1.) I responded:

> If Mr. McNease filled out the age and date of birth on the $250,000 application without asking Mr. Fretwell, and Mr. Fretwell signed the application with the incorrect information already filled out, then Mr. Fretwell "provided" the incorrect information to Mr.

McNease. . . .

(Document 146 at 2.)

Soon after receiving this response to its question, the jury returned its verdict finding that Mr. Fretwell "provided" an incorrect birth date and age when he applied for the $250,000 policy. The evidence supports the conclusion that Mr. McNease incorrectly filled in the age and birth date and that Mr. Fretwell signed the application without reading it or at least without paying attention to the age and birth date. The jury inquiry and prompt verdict are further indication that the jury agreed with this conclusion.

## IV.  The Claims Against Kansas City Life

### A.  The $100,000 Policy

#### 1.  The Remedy That Makes Sense

The evidence and verdict leave no doubt about the facts applicable to the $100,000 policy. Mr. Fretwell went to Mr. McNease to buy $100,000 in life coverage. Mr. McNease was an agent for Kansas City Life. Mr. McNease filled out an application by hand while Mr. Fretwell provided the relevant information. Included in the information Mr. Fretwell provided were his correct birth date and age. After Mr. McNease finished filling out the application, Mr. Fretwell signed it, and in due course Kansas City Life accepted it. Mr. Fretwell paid the premium year after year exactly as Kansas City Life said he had to do to obtain $100,000 in

coverage.

All would have gone exactly as it should have, but Mr. McNease—Kansas City Life's agent—made a mistake. There is an obvious solution that comports with fairness and common sense. The premium can now be adjusted retroactively, with interest, to the amount Kansas City Life would have quoted and Mr. Fretwell would have paid if Mr. McNease had done his job properly. This would correct the mistake and put all parties exactly where they would have been had no mistake occurred.

But alas, the question is not what fairness and common sense call for. Kansas City Life says the policy language and a Florida misstated-age statute provide that it should now be put in a better position than it would have occupied had its agent done his job correctly. Kansas City Life says, in effect, that it should profit from its own agent's mistake. It is a bold assertion that, on close analysis, comports with neither the policy language nor the statute. It turns out that here, as in many other instances, the law makes sense.

2. <u>The Rescission Statute</u>

For as long as there have been insurers, there have been applicants who provided them incorrect information. The remedy, in many circumstances, is that the insurer may rescind the policy and is thus exonerated from all liability other than for the return of the premiums. A Florida statute codifies—and provides

limits on—this rule:

> A *misrepresentation, omission, concealment of fact, or incorrect statement* may prevent recovery under the contract or policy only if any of the following apply:
>
> (a) The misrepresentation, omission, concealment, or statement is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by the insurer.
>
> (b) If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.

§ 627.409(1), Fla. Stat. (2008) (emphasis added). Under the statute, an insurer may rescind a policy if the applicant misstated the facts, but only if the misstatement was fraudulent or material and the insurer—if it had known the truth—would not have issued the same coverage for the same price. The statute of course does not apply when an insured tells the whole truth but the insurer's agent makes a mistake.

### 3.  The Misstated-Age Statute

By its terms, the rescission statute would apply to a life insurance policy issued at a lower premium based on an insured's incorrect statement of his age. But denying death benefits under a policy on this basis would be harsh. A different Florida statute provides a much more benign remedy. It provides, in

effect, that when an applicant misstates his age, the remedy is not rescission of the policy. Instead, the remedy is to adjust the death benefit to the amount that would have been available for the premium actually paid. The statute provides:

> Misstatement of age or sex.—Every insurance contract shall provide that if it is found that the age or sex of the insured, or of any other individual considered in determining the premium or benefit, *has been misstated*, the amount payable or benefit accruing under the policy shall be such as the premium would have purchased according to the correct age of sex. Such calculations shall be in accordance with the insurer's rate at date of issue, and at the option of the insurer this may be so specified in the policy.

Fla. Stat. § 627.456 (2008) (emphasis added). Again, the statute does not apply—or at least does not explicitly apply—when an insured tells the whole truth but the insurer's agent makes a mistake. And the statute does not apply—or at least does not explicitly apply—when a policy includes the insured's correct age in one place and an incorrect age in another place.

4. The Kansas City Life Policy

In the policy now at issue, Kansas City Life adopted the approach outlined in the misstated-age statute and added a further twist. The policy tracked the statute by providing, in effect, that if the applicant misstated his age, the remedy would be to adjust the death benefit to the amount that would have been available for the premium actually paid. But the twist was this: the policy provided that this would be the result only if the mistake was discovered *after* the insured died. If the

mistake was discovered *before* the insured died, the remedy would be to adjust the premium retroactively to the issuance of the policy, thus putting the parties precisely where they would have been if the mistake had never occurred. Thus the policy provided:

> Age and Sex
>
> If, while this policy is in force and the insured is alive, it is determined that the age or sex of the insured as stated on page 3 is not correct, the accumulated value under this policy will be adjusted by the difference in the actual monthly deductions made and the monthly deductions which should have been made for the correct age or sex, accumulated at the interest rates that were credited to the accumulated value.
>
> If, after the death of the insured and while this policy is in force, it is determined that the age or sex of the insured as stated on page 3 is not correct, the death benefit will be the net amount at risk that the most recent mortality charge at the correct age and sex would have purchased plus the accumulated value on the last monthly anniversary day before the date of death.

Policy 2597589 at 10 § 7.4 (document 94-2 at 11).

### 5. Applying the Misstated-Age Statute and the Insurance Policy

Under the misstated-age statute and the insurance policy, it is clear that had Mr. Fretwell misstated his age to Mr. McNease when applying for a policy, and had Kansas City Life learned of the error only after Mr. McNease died, then Kansas City Life would owe only the reduced death benefit that Kansas City Life now says it owes.

But when Mr. Fretwell applied for the $100,000 policy, he did not misstate

his age. He told the truth. Kansas City Life says this does not matter, because the second paragraph of the policy's § 7.4 calls for a reduced death benefit when the age "stated on page 3 is not correct," regardless of whose fault it was. The age "stated on page 3" was 46, even though elsewhere in the policy—in the application that was attached to the policy and incorporated by reference into it—Mr. Fretwell's age was explicitly stated as 52.

Kansas City Life's construction of the policy is incorrect. The second paragraph of § 7.4 applies only if "it is determined" that the age is incorrect "after the death of the insured." In fact, Kansas City Life—through its agent Mr. McNease—knew Mr. Fretwell's correct age all along; Mr. Fretwell provided it when he applied. Indeed, the policy itself listed the correct age in the incorporated application. It thus was not "determined" that the age was incorrect "after the death" of Mr. Fretwell. The reduced-death-benefit provision is, by its terms, inapplicable.

Instead, the first paragraph of § 7.4 applies. It provides that if it is determined "while the policy is in force" that the age stated on page 3 is incorrect, then the premium is retroactively adjusted, with interest, and the full death benefit remains intact. Because Kansas City Life knew all along that the age listed on page 3 was incorrect, it had this information "while the policy [was] in force." It can adjust the premium retroactively, but it cannot reduce the death benefit.

This reading of § 7.4 is supported by the canon calling for construction of an insurance policy in favor of the insured. *See, e.g., Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) ("Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy.").

The reading is also supported by the canon calling for construction of a policy in accord with an applicable statute. The statute corresponding with § 7.4 applies only when an insured's "age" has been "misstated," Fla. Stat. § 627.456, not when the insured has stated his "age" correctly but the *agent* has listed the *birth date* wrong. The statute says nothing about an insurer's decision to ignore the insured's correct statement of his age and to use instead an incorrect birth date to calculate for itself an incorrect age.

Perhaps more importantly, this reading of § 7.4 makes sense. An insurer should not be able to reduce a death benefit based only on a mistake made by the insurer itself, or by its agent, especially when the mistake can simply be corrected, thus preventing anyone from suffering a loss—or profiting—from the mistake.

In arguing the contrary, Kansas City Life cites *New York Life Ins. Co. v. Kay*, 251 So. 2d 530, 546-47 (Fla. 1st DCA 1971), which holds that an insurer need not investigate an insured's representation of his age. That is correct but misses the point. Had Mr. Fretwell provided the wrong age, Kansas City Life

would have been entitled to rely on the information without making an investigation, and Kansas City Life would now be able to reduce the death benefit as it proposes. *Kay* confirms this. But Mr. Fretwell provided the correct age, and Kansas City Life—through its agent—had the correct information all along, including on the application itself. The absence of a duty to investigate made no difference. Nothing in *Kay* suggests that an insurer can ignore information the insured accurately provides.

Kansas City Life also cites *Nat'l Credit Union Admin. Bd. v. Acacia Nat'l Life Ins. Co.*, 1995 U.S. App. LEXIS 18093 (6th Cir. 1995) (unpublished). There an agent listed an applicant's birth date as "12/5/37" instead of "1/25/37." After the insured died, the insurer discovered the mistake and adjusted the death benefit. The beneficiary asserted the insurer should have known of the error because the insured had other policies that listed the birth date correctly. In an unpublished opinion, the Sixth Circuit said that under Michigan law, an error in an insured's age allows a reduction of the death benefit, even if the insurer's agent made the error and the insurer should have known the truth. The opinion cited *Kay* as support for the holding, even though *Kay* did not go nearly this far.

*National Credit Union* of course is not binding. Indeed, even an unpublished *Eleventh Circuit* decision would not be binding. More importantly, the case involved markedly different facts. The application there did not include

the insured's correct age, as did the application here.  The insured there did not tell the agent, at the time of the application, his correct birth date and age, only to have the agent take down the birth date incorrectly.  And the Sixth Circuit, in its brief discussion, did not address the history or reason for the Florida rescission statute or its Michigan counterpart, or the history or reason for the misstated-age statutes that lessen the harsh remedy of the rescission statutes.

In sum, Mr. Fretwell provided his correct birth date and age when he applied for the $100,000 policy.  The application listed the correct age.  The application was incorporated into the policy.  The provisions of the policy and statute calling for a reduced death benefit when the policy is based on an incorrect age simply do not apply.  Kansas City Life is entitled to offset the premium underpayment against the death benefit—as has been done in the judgment that has been entered—but Kansas City Life is not entitled to reduce the death benefit itself.

6.  What Mr. Fretwell Should Have Learned After the Fact

One other issue relating to the $100,000 policy should be addressed.  Mr. Fretwell initially provided his correct age.  He never actually learned that Kansas City Life issued the policy based on an incorrect age.  But he *should* have learned, because he should have read the policy or the annual reports.  The jury so found in response to a special interrogatory that I included on the verdict form at Kansas City Life's request.  Kansas City Life says it should have to pay only the reduced

death benefit, because Mr. Fretwell should have learned of the error.

The assertion is wrong for three reasons.

First, this is a breach of contract case. The outcome is controlled by the contract—that is, by the insurance policy—as well as by the governing statute and any applicable common-law principles. Nothing in the contract, statute, or common law suggests that what Mr. Fretwell should have learned after the policy was issued has anything to do with the amount payable upon his death. I specifically invited Kansas City Life to submit authority supporting its position on the "should have learned" issue, and it submitted none.

Second, the insurance policy, in the first paragraph of § 7.4, says in effect that if Mr. Fretwell had learned of the error and advised Kansas City Life, the death benefit would have remained $100,000, and he would have had to pay the increased premium retroactively. That is exactly the effect of the judgment that already has been entered: Kansas City Life must pay the $100,000 death benefit, reduced by the additional premium that should have been paid for coverage in that amount. If Ms. Fretwell is now held accountable for what Mr. Fretwell "should have learned," the judgment will stay the same. In arguing the contrary, Kansas City Life is attempting to avoid the remedy that it chose when it wrote the policy.

Third, if what Mr. Fretwell learned after the fact matters at all, it is because of the common-law doctrines of unclean hands or estoppel. So if Mr. Fretwell had

learned that the policy used the wrong age, and if he had stood silent, Mr. Fretwell could perhaps be said to have unclean hands, or perhaps he would be estopped from relying on his own truthful statement of his age at the outset. Perhaps the remedy would be to treat the case as if Mr. Fretwell himself had misstated his age—thus making applicable the policy provision and statute calling for a reduced death benefit if the insured misstates his age. But the doctrines of unclean hands and estoppel do not ordinarily apply based on negligence, especially in litigation against a party that, like Kansas City Life, was equally or more negligent. Kansas City Life, after all, is vicariously responsible for Mr. McNease's failure to record Mr. Fretwell's birth date accurately, and it was Kansas City Life itself that received an application explicitly listing Mr. Fretwell's age as 52, incorporated the information into the policy, but nonetheless calculated the age as 46 and set the premiums accordingly. Kansas City Life should have done better; its complaint about what Mr. Fretwell should have done rings hollow.

### B. The $250,000 Policy

A substantial argument can be made that the result should be the same for the $250,000 policy. It was, after all, Mr. McNease's original mistake that led to the error on this policy as well.

But this time Mr. Fretwell signed an application that listed his age incorrectly. He did it without reading the application, or at least without noticing

the mistake. Mr. McNease had not just taken down the information Mr. Fretwell provided; instead, Mr. McNease had obtained the information in advance from another source. And this time the policy itself included only the incorrect age; the application that was attached and incorporated by reference did not list Mr. Fretwell's correct age. These facts are closer to those in the Sixth Circuit's unpublished decision in *National Credit Union*.

When a person signs an application listing his age incorrectly, and does it without contemporaneously telling the insurer or its agent his correct age, the person "misstates" his age. The $250,000 policy includes the same § 7.4 as the $100,000 policy. Mr. Fretwell's misstatement of his age brings into play the second paragraph of § 7.4 and the misstated-age statute, § 627.456. On the $250,000 policy Ms. Fretwell can properly recover only the reduced death benefit that he could have bought for the premiums he actually paid.

## V. The Claims Against Mr. McNease

The rulings on the claims against Kansas City Life mean that Mr. McNease's errors did not reduce Ms. Fretwell's recovery on the $100,000 policy but did reduce her recovery on the $250,000 policy. Even so, she has filed a "notice of voluntary dismissal without prejudice" of her claims against Mr. McNease.

Under Federal Rule of Civil Procedure 41(a)(1)(A), a plaintiff may

voluntarily dismiss a claim without a court order only if the defendant has not answered or moved for summary judgment. Mr. McNease has answered. I thus treat Ms. Fretwell's "notice" as a motion for voluntary dismissal without prejudice under Rule 41(a)(2).

For his part, Mr. McNease has moved for leave to file a motion for judgment based on the jury's verdict. Mr. McNease's position is based in substantial part on a misunderstanding of the jury's verdict, but it does not matter. Under the law of the circuit, and subject to exceptions not applicable here, a district court has discretion to grant a voluntary dismissal without prejudice even when a defendant objects and asserts he is entitled to a judgment on the merits. I elect to do that here.

To be sure, the Eleventh Circuit has said that "a district court considering a motion for dismissal without prejudice should bear in mind principally the interests of the defendant, for it is the defendant's interest that the court should protect." *McCants v. Ford Motor Co.*, 781 F.2d 855, 856 (11th Cir. 1986) (citing *LeCompte v. Mr. Chip, Inc.*, 528 F.2d 601, 604 (5th Cir. 1976)). But *McCants* also says, "in most cases a dismissal should be granted unless the defendant will suffer clear legal prejudice, *other than the mere prospect of a subsequent lawsuit*, as a result." *Id.* at 856-57 (emphasis in original) (citing *LeCompte*, 528 F.2d at 604).

The Eleventh Circuit followed *McCants* in *Pontenberg v. Boston Scientific*

*Corp.*, 252 F.3d 1253 (11th Cir. 2001) (per curiam).  There the district court granted a voluntary dismissal without prejudice, and the Eleventh Circuit affirmed, notwithstanding the defendant's assertion that it "had invested considerable resources, financial and otherwise, in defending the action, including by preparing the then pending summary judgment motion," and that the plaintiff "had failed to diligently prosecute the action."  *Id*. at 1256.  The Eleventh Circuit said that neither of these circumstances, "alone or together, conclusively or per se establishes plain legal prejudice requiring the denial of a motion to dismiss."  *Id.* (citing *Durham v. Fla. E. Coast Ry. Co.*, 385 F.2d 366 (5th Cir. 1967)).

Mr. McNease has made no showing that he will suffer "clear legal prejudice" if the claims against him are voluntarily dismissed without prejudice.  At most, he faces the "prospect of a subsequent lawsuit," *McCants*, 781 F.2d at 856-57, but that does not preclude dismissal without prejudice.  As a matter of discretion, I grant Ms. Fretwell's motion to voluntarily dismiss her claims against Mr. McNease without prejudice.

## VI.  Conclusion

A judgment already has been entered under Federal Rule of Civil Procedure 54(b) on Ms. Fretwell's claims against Kansas City Life.  The judgment correctly applied the relevant statutes and the provisions of the insurance policies to the facts as reasonably found by the jury.  A Rule 54(b) judgment now should be entered

voluntarily dismissing Ms. Fretwell's claims against Mr. McNease. This will leave pending only Kansas City Life's cross-claim against Mr. McNease, which will be addressed separately.

For these reasons,

IT IS ORDERED:

1. The defendant Kansas City Life Insurance Company's motion (document 154) to alter or amend the judgment entered May 27, 2009 (document 149) is DENIED.

2. The plaintiff's notice of voluntary dismissal (document 155) is treated as a motion for voluntary dismissal and is GRANTED. I expressly determine that there is no just reason for delay and expressly direct the clerk to enter judgment under Federal Rule of Civil Procedure 54(b) stating, "The plaintiff Sharon H. Fretwell's claims against the defendant Y. C. McNease are voluntarily dismissed without prejudice."

3. Mr. McNease's motion (document 153) for leave to file a motion for judgment against Ms. Fretwell is DENIED AS MOOT.

SO ORDERED on July 16, 2009.

s/Robert L. Hinkle_____
United States District Judge